## Kelly v. Gold, etc.

*Charles A. Rothman,* for plaintiff.
*Richman & Richman,* for defendant.

WINNET, J., November 30, 1943.—This suit raises the question of the constitutionality of the Emergency Price Control Act of 1942.[1]

Plaintiff on two different occasions purchased stockings from defendant and paid a sum in excess of the ceiling price established by the Office of Price Administration. On July 17, 1943, she paid $1.69 for a pair of silk and rayon stockings, whereas the ceiling price was $1.65 for all-silk stockings. On July 29, 1943, she paid $1.35 for a pair of stockings, the ceiling price of which was 89 cents. She has brought suit for $100 and attorney's fees and costs, the civil liability provided by section 205(c) of the act for two violations.[2]

---

[1] Act of January 30, 1942, 56 Stat. at L. 23, 50 U. S. C. §901.

[2] Sec. 205(e), Emergency Price Control Act: "If any person selling a commodity violates a regulation, order, or price schedule prescribing a maximum price or maximum prices, the person who buys such commodity for use or consumption other than in the course of trade or business may bring an action either for $50 or

Defendant has filed an affidavit of defense in lieu of a demurrer, challenging the act as being contrary to the provisions of the Constitution of the United States.

In his argument defendant's counsel contended that the act is unconstitutional in four respects: (1) It is a regulation of intrastate commerce; (2) it is an unlawful delegation of legislative authority by Congress; (3) the fixing of a ceiling price is taking property without due process as it may compel a merchant to sell at a loss; and (4) the imposition of a penalty of $50 for each offense under the act violates the due process clause.

The Emergency Price Control Act was a drastic measure. The country as a result of our defense and war activity was faced with the spiral of rising prices and the peril of catastrophic inflation. The entire war effort and the base of the economic system was endangered. To argue that in face of this great peril Congress was impotent to act is to negate the strength and wisdom of our constitutional government. The Constitution is a reservoir of great powers which Congress may exercise when necessary for the protection of our economy and our life. An emergency never creates a constitutional power but furnishes sometimes the occasion for the exercise of extraordinary power: Veix v. Sixth Ward Building & Loan Association of Newark, 310 U. S. 32, 39.

Action of Congress to control the price structure was clearly mandatory. The legislation it enacted was designed not only for "effective prosecution of the present

---

for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court. . . . Any suit or action under this subsection may be brought in any court of competent jurisdiction, and shall be instituted within one year after delivery is completed or rent is paid. The provisions of this subsection shall not take effect until after the expiration of six months from the date of enactment of this Act."

war" but also to prevent "post emergency collapse of values".[3]

Price control by a legislative body has already received judicial sanction. In Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, which involved the Bituminous Coal Conservation Act, and in which price-fixing and elimination of unfair competitive practices were sustained, the court said (p. 394):

"Price control is one of the means available to the states (*Nebbia* v. *New York*, 291 U. S. 502), and to the Congress (*United States* v. *Rock Royal Coöperative, supra*) [307 U. S. 533], in their respective domains (*Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511) for the protection and promotion of the welfare of the economy."

The Emergency Price Control Act is not based on the commerce clause, as defendant's argument assumes. It is an exercise of the general police power in the interest of public welfare under the power of Congress to wage war and to protect the monetary system, to name but two of its powers which would warrant the enactment.[4] While the Federal Government does not

---

[3] The Emergency Price Control Act is entitled: "An Act to further the national defense and security by checking speculative and excessive price rises, price dislocations, and inflationary tendencies . . ."

The purposes of the act are expressed in section 1(a): "It is hereby declared to be in the interest of the national defense and security and necessary to the effective prosecution of the present war, and the purposes of this Act are, to stabilize prices and to prevent speculative, unwarranted, and abnormal increases in prices and rents . . . to assure that defense appropriations are not dissipated by excessive prices; to protect persons with relatively fixed and limited incomes, consumers, wage earners, investors, and persons dependent on life insurance, annuities, and pensions, from undue impairment of their standards of living . . . to prevent a post emergency collapse of values. . . ."

[4] Roscoe Pound in Harvard Law Review, October 1943, "A Survey of Social Interests", makes an inventory of the social interests which press upon lawmakers, judges, and jurists for recognition and says (p. 17):

"In such a survey and inventory, first place must be given to the social interest in the general security—the claim or want or de-

have the same police power as is reserved to the States, nevertheless, where a general subject is properly within the scope of the constitutional powers of the Federal Government it has power to prescribe police regulations concerning that subject, and such powers are as broad as those which a State possesses concerning subjects within its reserved powers: Hamilton, etc., v. Kentucky Distilleries & Warehouse Co., 251 U. S. 146, 156; Speert et al. v. Morgenthau, etc., et al., 116 F. (2d) 301, 305.

Even though the fixed price may result in a loss to a dealer, the act would not necessarily be unconstitutional. In MacDonald Coal Mining Co. v. United States, 56 Ct. Cl. 440, affirmed in 261 U. S. 608, the coal price ceiling under the Lever Act was upheld although the plaintiff-producer could sell only at a loss.

"Although, as a general rule vested rights cannot be impaired by retrospective legislation, this is not true in respect of regulation under the police power": Speert et al. v. Morgenthau, etc., et al., supra, p. 305.

This defendant, however, is not entitled to the benefit of a plea of confiscation or lack of due process in being compelled to sell at a loss. She has filed a demurrer to the statement of claim. She has not pleaded a loss to her by reason of the price fixing. The constitutionality of an act cannot be questioned by a party whose rights are not affected thereby: Voeller et al. v. Neilston Warehouse Co. et al., 311 U. S. 531, 537.

---

mand, asserted in title of social life in civilized society and through the social group, to be secure against those forms of action and courses of conduct which threaten its existence."

This is similar to the definition of public policy given by Lord Truro in Egerton v. Lord Brownlow, 4 H. L. Cas. 1, 196, 10 Eng. Rep. 359, 437 (1853): "Public policy . . . is that principle of the law which holds that no subject can lawfully do that which has a tendency to be injurious to the public, or against the public good., . . ." Police power is the power of the government to achieve this social interest or public policy.

Has there been an unlawful delegation of legislative power by Congress? It is quite obvious that Congress itself cannot as a practical matter establish price ceilings and make the continual adjustments and changes for thousands of commodities. Too many changing factors enter into the establishment of a ceiling price. Our experience so far indicates how necessary it is to have the machinery to change the ceiling price from time to time. Only an administrative agency can make adjustments for "Speculative fluctuations, general increases or decreases in costs of production, distribution, and transportation, and general increases or decreases in profits . . ."[5]

Congress must enact legislation for fixing prices when it deems it necessary. It has the power to delegate to an administrative agency the fixing of individual prices.[6] In Sunshine Coal Co. v. Adkins, supra, the court said (p. 398):

---

[5] Section 2(a) of the act, outlining standards to guide the administrator in fixing ceiling prices.

[6] The argument of unlawful delegation of power has been consistently raised against almost every administrative agency established by Congress. The delegation of powers was sustained in Interstate Commerce Commission v. Louisville & Nashville R. R. Co., 190 U. S. 273, as to the power delegated to the Interstate Commerce Commission; Currin et al. v. Wallace, etc., et al., 306 U. S. 1, as to power delegated to the Department of Agriculture in the Tobacco Inspection Act; United States v. Rock Royal Coöperative, Inc., et al., 307 U. S. 533, as to the delegation of powers in the Agricultural Marketing Agreement Act; Mulford et al. v. Smith et al., 307 U. S. 38, as to powers delegated in Agricultural Adjustment Act of 1938; Sunshine Coal Co. v. Adkins, 310 U. S. 381, as to price-fixing powers delegated under the Bituminous Coal Conservation Act; Davis et al. v. Securities and Exchange Commission, 109 F(2d) 6, certiorari denied, 309 U. S. 687, as to delegation of powers to the Securities and Exchange Commission; Bastian et al. v. United States, 118 F.(2d) 777, as to delegation under the Emergency Relief Appropriations Act; Opp Cotton Mills, Inc., et al., v. Administrator of Wage and Hour Division, etc., 312 U. S. 126, as to the delegation of powers to the Wage and Hour Administrator.

"Delegation by Congress has long been recognized as necessary in order that the exertion of legislative power does not become a futility."

The only restriction on the delegation of power by Congress is that proper standards must be set up by it for the guidance of the administrative agency. As stated in Opp Cotton Mills, Inc., et al. v. Administrator of the Wage and Hour Division, etc., 312 U. S. 126, 144:

". . . where . . . the standards set up for the guidance of the administrative agency, the procedure which it is directed to follow and the record of its action which is required by the statute to be kept or which is in fact preserved, are such that Congress, the courts and the public can ascertain whether the agency has conformed to the standards which Congress has prescribed, there is no failure of performance of the legislative function."

The Emergency Price Control Act requires the administrator to fix ceilings which will be generally fair and equitable and effectuate the purposes of the act. Under section 2 (a) he is required to give due consideration to prices prevailing for the commodity at a specified time and make adjustment as he may determine to be of general applicability to the commodity involved. Every regulation establishing a ceiling must be accompanied by a statement of the considerations involved in its issuance. Provisions are made in the act for hearings and for appeals. It would seem, therefore, that Congress has set up sufficient standards in the act for the guidance of an administrative agency and has made no unreasonable delegation of power.

The only remaining question of the defendant to be disposed of is in the contention that section 205 (e), in allowing a buyer $50 or treble damages, whichever is the greater, plus attorney's fees and costs, violates the due process clause of the Constitution.

This act, like many similar acts of Congress, envisages two classes of action to enforce compliance with its provisions: (1) By the Government itself, usually in the nature of a criminal action, and (2) action by the person who is damaged by the violation. Under the Sherman Act and the Clayton Act there is provision for treble damages to redress private injury. These provisions have been consistently upheld by the courts. A legislature may very properly establish civil liability which flows from the violation of an act. Such provisions are reasonably calculated to enforce compliance. It must have been quite obvious to Congress that treble damages would not be a great factor enforcing compliance with the provisions of the Emergency Price Control Act. The amount of actual damage in most cases, as in the present one, is very small indeed. In fact, the defendant contends, since the damage is so trifling the doctrine of de minimis non curat lex should be applied and plaintiff denied recovery. The doctrine of de minimis has no application where there is a declared legislative policy to enforce. To refuse to enforce it would be to question the wisdom of the legislation and this is not the function of the court.[7] Certainly it is of the greatest importance to discourage violations of this petty nature, the sum total of which demoralizes law enforcement and defeats the policy of Congress. Giving a buyer a right to bring suit for $50 for each violation is an incentive for civil action against those who are violating the act and is reasonably calculated to enforce

---

[7] Hamilton, etc., v. Kentucky Distilleries & Warehouse Co., 251 U. S. 146, 161:

"No principle of our constitutional law is more firmly established than that this court may not, in passing upon the validity of a statute, enquire into the motives of Congress. . . . Nor may the court enquire into the wisdom of the legislation. . . . Nor may it pass upon the necessity for the exercise of a power possessed, since the possible abuse of a power is not an argument against its existence. . . ."

compliance. Section 205 (*e*) does not violate due process and is not confiscatory under the Constitution.

The affidavit of defense raising questions of law is dismissed. Leave is granted to defendant to file an affidavit of defense on the merits within 15 days.